# EXHIBIT L

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- x

DEIRDRE MACNAMARA, DEEPA MAJMUDAR,
ELIZABETH FLEISCHMAN, REBECCA STONEBACK, x
JASON BARRUS, RANDALL STEKETEE, WENDY
STEFANELLI, DANIELLE WALSH, WILLIAM      x
HOBBS, SIMON HARAK, SONIA CHANDRA,
CELINE MALANUM, ERIKA BIDDLE, DIANA      x
RAIMONDI, RACHEL HEINOLD, NOAH CHARNEY,
STACY COTLER, EMILY FRIEDMAN,            x
SHAHRZAD GHAHREMANI-GHADJAR,
WILLIAM STEYERT JR., CHRISTOPHER THOMAS, x
KATE ESPOSITO, CAROLYNE ALI-KHAN,
and MICHAEL BINDER, individually, and on behalf of   x
all others similarly situated,

                                   x

                     Plaintiffs,

           -against-       x

THE CITY OF NEW YORK, a municipal entity;        x
MICHAEL BLOOMBERG, Mayor of the City of
New York; RAYMOND KELLY, New York City Police    x
Commissioner; GARY MCCARTHY, Deputy
Commissioner of the New York City Police Department   x
("NYPD"); DAVID COHEN, Deputy Commissioner of
Intelligence for the NYPD; STEPHEN                x
HAMMERMAN, Deputy Commissioner for Legal
Matters for the NYPD; THOMAS DOEPFNER,           x
Assistant Deputy Commissioner for Legal Matters for
the NYPD; NYPD Special Counsel                   x
RUBY MARIN-JORDAN; JOSEPH ESPOSITO,
Chief of the New York City Police Department;    x
NICHOLAS ESTAVILLO, NYPD Chief of Patrol;
THOMAS GRAHAM, Commander, Disorders Control      x
Unit for the NYPD; BRUCE SMOLKA, former
Commander, Patrol Borough Manhattan South for the   x
NYPD; TERENCE MONAHAN, Assistant Chief of the
Bronx Borough Command; JOHN J. COLGAN,           x
Assistant Chief for the NYPD; JACK MCMANUS,
Assistant Chief; MICHAEL SCAGNELLI, Assistant    x
Chief for the NYPD; STEPHEN PARAGALLO,
Deputy Chief for the NYPD; JAMES O'NEILL,         x



**No. 04 Civ. 9216 (RJS) (JCF)**

**SECOND AMENDED**
**CLASS ACTION**
**COMPLAINT**

**JURY TRIAL**
**DEMANDED**

Deputy Chief for the NYPD; NYPD Inspector
JAMES ESSIG; NYPD Inspector THOMAS GALATI;      x
NYPD Inspector GERALD DIECKMANN;
NYPD Inspector JAMES SHEA; NYPD Inspector       x
THOMAS DIRUSSO; NYPD Inspector ANTHONY
BOLOGNA; NYPD Inspector JAMES MCCARTHY;         x
NYPD Inspector KEVIN WARD; NYPD Deputy
Inspector KERRY SWEET; NYPD Inspector JOHN      x
HUGHES; NYPD Captain MATTHEW HYLAND;
NYPD Captain CHRIS MONAHAN; NYPD Captain        x
(First Name Unknown ("FNU")) JASKARAN; NYPD
Captain RONALD MERCANDETTI; NYPD Captain        x
JOSEPH DOWLING; NYPD Captain WILLIAM J.
TRACEY; NYPD Captain WILLIAM CROSSAN;           x
NYPD Captain DERMOT SHEA; NYPD Lieutenant
MARK KEEGAN; NYPD Lieutenant JOHN WOLF;         x
NYPD Sergeant MICHAEL INGRAM; New York City
Police Supervisor ("FNU") ROMAN; NYPD Sergeant  x
RONALD MYERS (Shield No. 5146); NYPD Sergeant
RAFFI OVANESSIAN; New York City Police Officers x
JOHN WOODS (Shield No. 2878); BRIAN
MCSWEENEY (Shield No. 31411); MELVIN REYES;     x
MONA PHILLIPS; STEPHEN NELSON; NOEL
RODRIGUEZ (Shield 09319); NEIL RODRIGUEZ        x
(Shield No. 21015); DENISE ROSE-HINKSMAN
(Shield No. 19599); MICHAEL FILOSETA; KEVIN     x
SAM;TYRONE RIGGAN; MICHAEL BOYLE;
MICHAEL BALICKI; JOHANNA GREENBERG-             x
-MCMINN; JASON MARTINOFF (Shield No. 30808);
ANTHONY MASON; KEVIN SCOTT; ELVIS SUERO         x
(Shield No. 3836); DERRICK BAITY; JAMES CHUNG;
GEORGE SHANNON; COURTNEY HAMLIN and             x
MELISSA ROMAN-DE LACY; New York City Police
Supervisors and Commanders RICHARD ROEs 1-50;   x
New York City Police Officers JOHN DOEs 1-50,

                                                x

                    Defendants.

--------------------------------------------------------------------- x

2

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which the named plaintiffs, DEIRDRE MACNAMARA,

DEEPA MAJMUDAR, ELIZABETH FLEISCHMAN, REBECCA STONEBACK, JASON BARRUS,

RANDALL STEKETEE, WENDY STEFANELLI, DANIELLE WALSH, WILLIAM HOBBS, SIMON

HARAK, SONIA CHANDRA, CELINE MELANUM, ERIKA BIDDLE, DIANA RAIMONDI,

RACHEL HEINOLD, NOAH CHARNEY, STACY COTLER, EMILY FRIEDMAN, SHAHRZAD

GHAHREMANI-GHADJAR, WILLIAM STEYERT JR., CHRISTOPHER THOMAS, KATE

ESPOSITO, CAROLYNE ALI-KHAN, and MICHAEL BINDER individually, and on behalf of a class

of more than 1800 others similarly situated, seek relief for various constitutional violations, including,

*inter alia*, false arrest and excessive force, and, as to claims for (1) excessively and unreasonably

prolonged, unnecessary and punitive detention, (2) excessive, unnecessary and punitive conditions of

confinement that resulted from defendants' lack of reasonable care and deliberate indifference and were

inflicted on the plaintiffs and others similarly situated because of their exercise, or perceived exercise, of

First Amendment protected speech activity, and (3) subjection to indiscriminate mass arrests without

individualized determinations of probable cause at or in the vicinity of demonstrations before and during

the 2004 Republican National Convention ("the RNC" or "the relevant period"). The named plaintiffs

assert claims, on behalf of themselves and all other similarly situated individuals for defendants'

violation, under color of state law, of their rights, privileges and immunities secured by the Civil Rights

Act of 1871, 42 U.S.C. §1983, the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United

States Constitution, and the Constitution and laws of the State of New York.

2.      The defendants in this action, THE CITY OF NEW YORK, a municipal entity;

3

MICHAEL BLOOMBERG, Mayor of the City of New York; RAYMOND KELLY, New York City Police Commissioner; GARY MCCARTHY, Deputy Commissioner of the New York City Police Department ("NYPD"); DAVID COHEN, Deputy Commissioner of Intelligence for the NYPD; STEPHEN HAMMERMAN, Deputy Commissioner for Legal Matters for the NYPD; THOMAS DOEPFNER, Assistant Deputy Commissioner for Legal Matters for the NYPD; NYPD Special Counsel RUBY MARIN-JORDAN; JOSEPH ESPOSITO, Chief of the New York City Police Department; NICHOLAS ESTAVILLO, NYPD Chief of Patrol; THOMAS GRAHAM, Commander, Disorders Control Unit for the NYPD; BRUCE SMOLKA, former Commander, Patrol Borough Manhattan South for the NYPD; TERENCE MONAHAN, Assistant Chief of the Bronx Borough Command; JOHN J. COLGAN, Assistant Chief for the NYPD; JACK MCMANUS, Assistant Chief for the NYPD; MICHAEL SCAGNELLI, Assistant Chief for the NYPD; STEPHEN PARAGALLO, Deputy Chief for the NYPD; JAMES O'NEILL, Deputy Chief for the NYPD; NYPD Inspector JAMES ESSIG; NYPD Inspector THOMAS GALATI; NYPD Inspector GERALD DIECKMANN; NYPD Inspector JAMES SHEA; NYPD Inspector THOMAS DIRUSSO; NYPD Inspector ANTHONY BOLOGNA; NYPD Inspector JAMES MCCARTHY; NYPD Inspector KEVIN WARD; NYPD Deputy Inspector KERRY SWEET; NYPD Inspector JOHN HUGHES; NYPD Captain MATTHEW HYLAND; NYPD Captain CHRIS MONAHAN; NYPD Captain (First Name Unknown ("FNU")) JASKARAN; NYPD Captain RONALD MERCANDETTI; NYPD Captain JOSEPH DOWLING; NYPD Captain WILLIAM J. TRACEY; NYPD Captain WILLIAM CROSSAN; NYPD Captain DERMOT SHEA; NYPD Lieutenant MARK KEEGAN; NYPD Lieutenant JOHN WOLF; NYPD Sergeant MICHAEL INGRAM; New York City Police Supervisor ("FNU") ROMAN; NYPD Sergeant RONALD MYERS (Shield No. 5146); NYPD Sergeant RAFFI OVANESSIAN; New York City Police Officers JOHN WOODS (Shield No.

4

2878); BRIAN MCSWEENEY (Shield No. 31411); MELVIN REYES; MONA PHILLIPS; STEPHEN NELSON; NOEL RODRIGUEZ (Shield 09319); NEIL RODRIGUEZ (Shield No. 21015); DENISE ROSE-HINKSMAN (Shield No. 19599); MICHAEL FILOSETA; KEVIN SAM; TYRONE RIGGAN; MICHAEL BOYLE; MICHAEL BALICKI; JOHANNA GREENBERG-MCMINN; JASON MARTINOFF (Shield No. 30808); ANTHONY MASON; KEVIN SCOTT; ELVIS SUERO (Shield No. 3836); DERRICK BAITY; JAMES CHUNG; GEORGE SHANNON; COURTNEY HAMLIN and MELISSA ROMAN-DE LACY; New York City Police Supervisors and Commanders RICHARD ROEs 1-50; New York City Police Officers JOHN DOEs 1-50, acting individually and in their official capacities, jointly and severally, implemented, enforced, encouraged, sanctioned and/or ratified policies, practices and/or customs to punish peaceful protest during the RNC by, *inter alia*, engaging in indiscriminate mass arrests which were unlawful and without probable cause; instituting a system of perjured sworn statements to attempt to justify those unlawful arrests; enforcing a facially invalid parading statute; applying parading and disorderly conduct statutes in an overly broad fashion against people who were engaged, or perceived by the police as engaged, in protest activity; instituting a system of preventive detention to keep lawful peaceful demonstrators off the streets during the height of the RNC; requiring that all persons arrested in connection with the RNC be fingerprinted notwithstanding the level of the alleged offence and arrestees' possession of valid identification, based on manipulated and distorted police intelligence; and subjecting those arrested in connection with the RNC to intolerable, cruel and inhumane conditions, including, *inter alia*, housing them in a former bus depot on a grease-covered floor, and denying them access to a phone and to legal counsel for an inordinate and unreasonable amount of time.

3.    In promulgating and implementing these policies, defendants clearly knew that during the

5

## Named and Un-Named Defendants

35.     Defendant CITY OF NEW YORK ("the City") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

36.     Defendant MICHAEL BLOOMBERG is and was, at all times relevant herein, the Mayor of the City of New York and the chief policy making official for the City and its departments, including the New York City Police Department ("NYPD") and is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein. He is sued in both his individual and official capacities.

37.     Defendant RAYMOND KELLY is and was at all times relevant herein, the Police Commissioner for the City of New York, and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and /or customs complained of herein. He is sued individually and in his official capacity.

38.     Defendant DAVID COHEN is and was at all times relevant herein, the Deputy Commissioner for Intelligence for the New York City Police Department, and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and /or customs complained of herein. COHEN is sued individually and in his official capacity.

39.     Defendant STEPHEN HAMMERMAN, is and was at all times relevant herein, the Deputy Commissioner for Legal Matters for the New York City Police Department, and he is

to knowledge gained from the fact that many groups applied to defendant CITY for permits to engage in protest during the relevant period, the defendants were in possession through their own intelligence, as well as intelligence from other law enforcement agencies, that provided them extensive knowledge about what plans were being made by various groups and individuals to demonstrate during the relevant period.

64.    Defendant DAVID COHEN, the Deputy Commissioner for Intelligence for the New York City Police Department, supervised the gathering of intelligence information leading up to the RNC. He was also responsible for analyzing and presenting the intelligence to, among others, Police Commissioner KELLY, for the purpose of the NYPD's planning how to police during the RNC. Defendant COHEN distorted the police intelligence by conflating constitutionally protected activities with violence and terrorism. Based on Cohen's interpretation and presentation of intelligence data, defendants adopted unconstitutional no-summons and blanket fingerprinting policies for all RNC arrestees.

65.    Months before the start of the RNC, the City of New York, through its various agencies in the criminal justice system, began to prepare for any arrests and prosecutions which might follow political demonstrations during the RNC. Both defendant Police Commissioner Raymond Kelly and District Attorney Robert Morgenthau publicly stated the potential for more than 1,000 arrests a day during the RNC. The NYPD also reportedly estimated a potential total of 3,000 arrests during the week of the RNC.

66.    In anticipation of the possibility for mass arrests, the Office of Court Administration ("OCA") more than doubled arraignment capacity, staffing four day arraignment parts, four night arraignment parts, and a midnight shift. The New York County District Attorney's ("DANY") office

23

communicated to NYPD police officers and supervisors through the public statements made by NYPD officials, including Police Commissioner Kelly, which included remarks about the threat posed to New York City by "hard-core" and "dangerous" protestors. This sentiment was reiterated, summarized and ratified in the public statements of defendant BLOOMBERG in which he identified the plaintiffs and those similarly situated as "terrorists" and "guilty" criminals.

69.      The fact that 1,000 arrests per day, or an estimated 3,000 arrests in total, might occur during the RNC and would have to be processed by the NYPD, the District Attorney's Office and the Courts was not an exigent circumstance that justified even a temporary interference with the constitutional and state law rights of those people arrested. In a city with the largest municipal police force in the country, numbering more than 40,000 members, sufficient resources clearly were present and within the control of the defendants to timely process the expected numbers of arrestees during the RNC. In fact, while the total number of 1,128 arrests on the evening of August 31, 2004 was quite high for any borough, it was lower in number than arrests made at other demonstrations in the past. For example on June 14, 1982, over 1,600 protesters were arrested within several hours. These arrestees were largely processed on buses and most were released the same day, often within a few hours.

**Defendants' Unconstitutional Indiscriminate Mass Arrest Policy**

70.      During the RNC, defendants CITY OF NEW YORK, BLOOMBERG, KELLY, G. MCCARTHY, COHEN, HAMMERMAN, DOEPFNER, MARIN-JORDAN, ESPOSITO, ESTAVILLO, GRAHAM, SMOLKA, MONAHAN, COLGAN, MCMANUS, SCAGNELLI, PARAGALLO, O'NEILL, ESSIG, GALATI, DIECKMANN, J. SHEA, DIRUSSO, BOLOGNA, MCCARTHY, WARD, SWEET, HUGHES, HYLAND, C. MONAHAN, JASKARAN, MERCANDETTI, TRACEY, DOWLING, CROSSAN, D. SHEA, KEEGAN, WOLF, INGRAM, ROMAN,     MYERS,

25

OVANESSIAN, WOODS, MCSWEENEY, REYES, PHILLIPS, NELSON, NOEL RODRIGUEZ, NEIL RODRIGUEZ, ROSE-HINKSMAN, FILOSETA, SAM, RIGGAN, BOYLE, BALICKI, GREENBERG-MCMINN, MARTINOFF, MASON, SCOTT, SUERO, BAITY, CHUNG, SHANNON, HAMLIN, M. ROMAN-DE LACY,  ROEs 1-50 and DOES 1-50 designed, adopted and implemented policies, practices and/or customs of indiscriminately arresting, without just or probable cause, large groups of people who were peacefully assembled and/or who were participating in, observing or merely in the vicinity of demonstrations and protests.

71.     This indiscriminate mass arrest policy was a refinement of the tactic employed by the defendants at other demonstrations which had taken place in the City in the few years prior to the RNC, including, *inter alia*, the February 15, 2003 anti-war march, *see Haus, et al., v. City of New York, et al.*, 03 Civ. 4915 (RWS), and the April 7, 2003 Carlyle Group protest, see *Larsen, et al., v. City of New York, et al.* 04 Civ. 665 (RWS), of using mass arrests to unlawfully suppress protected First Amendment conduct.

72.     During the RNC, the defendants extended and employed this policy, practice and/or custom, in an arbitrary and capricious manner, and in the absence of probable cause, to arrest entire groups of people who were lawfully engaged in protected First Amendment activity or who were observing such activity, or were simply passing by at the time arrests were being made.

73.     Defendants' policy of indiscriminate mass arrest involved the following components:

    A.     Use of mesh netting, lines of police officers and/or lines of police bicycles or scooters to corral and essentially trap large groups of people who were engaging, or were perceived by the NYPD as engaging, in political protest or demonstration.

    B.     Failure to distinguish bystanders, media personnel and legal observers from groups of corralled or trapped people prior to affecting arrests.

26

C.  Failure to advise prospective arrestees who were behaving in a peaceful and non-violent manner that they were in violation of any law or ordinance.

D.  Failure to give dispersal orders that, if given at all, were audible to all prospective arrestees.

E.  Failure to provide a reasonable opportunity to disperse, including actively preventing people who wanted to disperse from leaving.

F.  Discriminatory enforcement of the unconstitutionally vague, overbroad and strict-liability municipal regulation set forth in New York City Administrative Code § 10-110 ("Parading Without a Permit") and over broad enforcement of New York State Penal Law §§ 240.20[5] & [6] ("Disorderly Conduct").

G.  Assigning one arresting officer to five arrestees, regardless of whether the officer had seen any of the five individuals prior to their arrest or had even been present at the scene when the decision to arrest was made.

H.  At the instruction or with the assistance of NYPD Legal Bureau attorneys and with the knowledge of Criminal Justice Bureau ("CJB") supervisors, creating perjured sworn statements wherein arresting officers attested that they had personally observed arrestees engaging in conduct that provided a basis for the alleged probable cause to arrest when the officers, in fact, had no personal knowledge of the arrestees' conduct.

I.  At the instruction or with the assistance of NYPD Legal Bureau attorneys and with the knowledge of CJB supervisors, creating arrest paperwork, which contained knowingly false statements (e.g., that orders to disperse were given when they were not) for the purpose of insuring that the paperwork was facially sufficient when presented to the Manhattan County District Attorney.

74.  The locations and dates when the plaintiffs and members of the plaintiff class were subjected to the defendants' unconstitutional indiscriminate mass arrest policy, practice and/or custom include, but are not limited to, the following:

A.  On August 27, 2004, the defendants, pursuant to their indiscriminate mass arrest policy, arrested numerous individuals who were participating, or perceived by the defendants as participating in, a group bicycle ride at various points in Manhattan, including 35th Street between Tenth Avenue and Dyer, 7th

27

Avenue between 34th Street and 35th Street, and Second Avenue between 9th Street and 10th Street. On that date, the defendants indiscriminately arrested anyone seen riding a bicycle or standing with a bicycle for allegedly having participated in a bike event known as "Critical Mass," regardless of whether any police officer had personally observed the arrestee engaging in any unlawful conduct and even though "Critical Mass" bike events had been ongoing and sanctioned by the defendants on a monthly basis for years prior to the RNC. To effectuate these unlawful arrests, the defendants used mesh nets and lines of police officers on foot **or with scooters** to trap and arrest scores of people with bicycles without warning. Plaintiff MICHAEL BINDER was arrested by RICHARD ROE and/or JOHN DOE defendants, including, upon information at belief, defendants P.O. REYES and/or P.O. MCSWEENEY, at the direction of a RICHARD ROE defendant, on August 27, 2004 while standing with his bicycle at a red light on Seventh Avenue at 35th Street. Defendant BRUCE SMOLKA was the incident commander at this location for at least part of the time when arrests were being made. Inspector JAMES SHEA gave orders for some arrests to be made at 35th Street and Seventh Avenue. Defendants Inspector ANTHONY BOLOGNA, Inspector JOHN HUGHES, Captain WILLIAM J. TRACEY, Captain MATTHEW HYLAND, Captain CHRIS MONAHAN and Captain JASKARAN supervised, and were in whole and/or in part responsible for, the policing operations on Seventh Avenue between 34th and 35th Streets.

B.    On August 27, 2004, Plaintiff ELIZABETH FLEISCHMAN, along with others similarly situated, was trapped by two lines of police officers and, at the decision of defendant Inspector GERALD DIECKMANN, arrested with her bicycle on 35th Street between Dyer Street and Ten Avenue. Defendant P.O. MASON was assigned as FLEISCHMAN's arresting officer.

C.    Plaintiff RANDALL STEKETEE, who was not involved in the "Critical Mass" ride and who was on his way home after seeing a play, was arrested, by and at the direction of one or more RICHARD

28

ROE or JOHN DOE defendants, with his bike at or near the intersection of Second Avenue and 10th Street. Defendant P.O. BALICKI was assigned as STEKETEE's arresting officer. Defendants Deputy Commissioner GARY MCCARTHY, Chief of Department JOSEPH ESPOSITO, Chief of Patrol NICHOLAS ESTAVILLO, Assistant Chief MICHAEL SCAGNELLI, Assistant Chief TERENCE MONAHAN, former commanding officer of Patrol Borough Manhattan South, BRUCE SMOLKA, Deputy Chief JAMES O'NEILL, Inspector JAMES MCCARTHY, commander of the Disorders Control Unit, THOMAS GRAHAM; and Captain JOSEPH DOWLING supervised, and were in whole and/or in part responsible for, the policing operations on Second Avenue between 9th and 10th Streets. At no time were plaintiffs and the others arrested at the foregoing August 27, 2004 locations given an order and/or a meaningful opportunity to disperse, nor were they advised that they were in violation of any law or ordinance of the State or City of New York. Plaintiffs and the other individuals arrested at the foregoing August 27, 2004 locations were detained at Pier 57 before they were taken to Central Booking for arraignment before a judge.

D.     On August 29, 2004, the defendants again employed the indiscriminate mass arrest policy, including the use of mesh nets, to entrap and arrest groups of people lawfully standing on sidewalks in Times Square at 45th Street and Eight Avenue and at 46th and Seventh Avenue, including legal observers and members of the media. Following their arrest, these RNC arrestees were transported to Pier 57, where they were detained before being taken to Central Booking for arraignment before a judge.

E.     On August 29, 2004, the defendants again employed the indiscriminate mass arrest policy by using lines of police and mesh nets, to entrap and arrest individuals riding bikes, rollerblading and walking on 37th Street between Broadway and 7th Avenue. Plaintiff CAROLYN ALI-KHAN, was rollerblading for recreation north on Sixth Avenue and turned onto 37th Street. She was stopped by police, surrounded by

29

mesh nets and, at the decision of defendant Captain JOSEPH DOWLING, based on false information provided by defendant P.O. GEORGE SHANNON, and approved by defendant Inspector JAMES SHEA, was arrested for multiple alleged offences, all involving a bicycle. Defendant P.O. COURTNEY HAMLIN was assigned as ALI-KHAN's arresting officer. Plaintiff ALI-KHAN does not own a bicycle and does not know how to ride one. At no time were plaintiff ALI-KHAN and the others arrested at the foregoing location given an order and/or a meaningful opportunity to disperse, nor were they advised that they were in violation of any law or ordinance of the State or City of New York. Defendant P.O. COURTNEY HAMLIN was plaintiff ALI-KHAN's arresting officer. Plaintiff ALI-KHAN and the other individuals arrested at the foregoing location were detained at Pier 57 before they were taken to Central Booking for arraignment before a judge.

F.    On August 31, 2004, the defendants again employed the indiscriminate mass arrest policy, including the use of mesh nets and police lines, to arrest participants in a demonstration organized by the War Resisters League at Fulton Street between Church Street and Broadway in Lower Manhattan. In this case, the demonstrators negotiated with, and were specifically told by, NYPD officers and supervisors, including defendant Inspector THOMAS GALATI, that they would be allowed to march east on Fulton Street and north on Broadway toward Madison Square Garden, the site of the RNC, so long as the participants did not block traffic and obeyed the traffic signals at intersections. A videotape of the event specifically shows police officials informing demonstrators that the march could precede in the fashion described above. Almost immediately after the march began and before it had even proceeded one full block, NYPD officers and supervisors, on the orders of defendant Assistant Chief TERENCE MONAHAN, halted the march, surrounded over 200 people, again utilizing the mesh nets, and arrested them all, even though they had remained on the public sidewalk, were not blocking the sidewalk, and had made every

30

effort to comply with police instructions. Defendants MONAHAN and GALATI made the decision that the plaintiffs and those similarly situated on Fulton Street were to be arrested. Those arrested were not given reasonably audible orders to disperse and/or were not given any meaningful opportunity to disperse. Plaintiffs SIMON HARAK, WILLIAM STEYERT, JR., and DIANA RAIMONDI were arrested at this location. Defendants P.O. FILOSETA, P.O. MARTINOFF and P.O. BOYLE were assigned as plaintiffs' respective arresting officers. Following their arrest, the plaintiffs and other members of the class were transported to Pier 57 where they were detained before being taken to Central Booking for arraignment before a judge. On October 6, 2004, the Manhattan District Attorney's office announced that it would dismiss 227 prosecutions arising out of the August 31st arrests on Fulton Street, including the arrest of HARAK, STEYERT and RAIMONDI.

G.    Again, on August 31, 2004, the defendants employed the indiscriminate mass arrest policy, including the use of mesh nets and police lines, to arrest individuals who were either participating in, observing, or were merely in the vicinity of a march which began in Union Square Park and traveled north on Union Square East. The demonstrators, and those observing them, were directed by defendant NYPD police officers to turn east onto 16th Street between Union Square East and Irving Place. When they arrived at Irving Place, they were told by the police that they could go no further and would have to exit at the Union Square East end of the block. However, at the decision of defendant Lt. MARK KEEGAN the Union Square East end of the block was also barricaded by a line of police officers, who refused to allow people to exit 16th Street. Everyone trapped on this block of 16th Street, whether they were protestors, observers, or just happened to be in the area, was then arrested, including Plaintiffs DEEPA MAJMUDAR, SONIA CHANDRA, CELINE MELANUM, DANIELLE WALSH, ERIKA BIDDLE and EMILY FRIEDMAN. The arrest decision was made by defendants Inspector JAMES ESSIG and Inspector

31

GERALD DIECKMANN and approved by defendant Inspector THOMAS GALATI. Prior to their arrest, the **plaintiffs** had complied with all orders given to them by the police. At no time were they, or others on 16th Street, given an order or a meaningful opportunity to disperse, nor were they advised that they were in violation of any law or ordinance of the State or City of New York. Defendants P.O. TYRONE RIGGAN, P.O. KEVIN SAM, P.O. ELVIS SUERO, P.O. DERRICK BAITY and P.O. NOEL RODRIGUEZ were assigned as the plaintiffs' respective arresting officers. Following their arrest, the plaintiffs and others similarly situated on 16th Street were transported to Pier 57 where they were detained before being taken to Central Booking for arraignment before a judge.

H.    On August 31, 2004, the defendants again employed the indiscriminate mass arrest policy, including the use of mesh nets and police lines, to arrest individuals proceeding west on 17th Street from Broadway to Fifth Avenue, some of whom were headed toward the Free Speech Zone at Madison Square Garden and some of whom were merely in the vicinity, going about their lives. These individuals had been instructed by police at Broadway and 17th Street that they could not continue traveling north on Broadway and should proceed west on 17th Street. The individuals complied with this instruction. When the individuals arrived at 17th Street and Fifth Avenue, they were stopped by a line of police and told that they could go no further. When certain individuals, including plaintiff REBECCA STONEBACK, asked how they could get to the Free Speech Zone, defendant Inspector THOMAS DIRUSSO told them, in substance or words, to "hold on" and he would tell them where to go. The individuals were then told by the police to form a line in the street of 17th Street, and subsequently to move to the south sidewalk of 17th Street. The individuals complied with both orders. The individuals, including plaintiffs STONEBACK and MACNAMARA, were then surrounded by police officers and, at the decision of defendants Inspector DIRUSSO and Inspector WARD, arrested. Before plaintiffs and those similarly situated were arrested, the

32

police formed a barricade across 17th Street closer to Broadway to prevent plaintiffs and others from leaving the block. Defendants P.O. MONA PHILLIPS and P.O. STEPHEN NELSON were assigned as plaintiffs STONEBACK and MACNAMARA's respective arresting officers. Defendant Police Supervisor ROMAN also participated in, and was responsible in part, for affecting plaintiffs' arrest and detention. At no time were the individuals on 17th Street given an order to disperse or advised that they were in violation of any law or ordinance of the State or City of New York. Following their arrest, the plaintiffs and members of the plaintiff class were transported to Pier 57, where they were detained before being taken to Central Booking for arraignment before a judge.

I.      On August 31, 2004, the defendants again employed the indiscriminate mass arrest policy, to arrest individuals who were participating in, observing, or were merely in the vicinity of a march on Park Avenue between 26th and 27th Streets. These arrests were made at approximately the same time as mass arrests were being made on 16th and 17th Streets. The marchers, who had been at Union Square, were walking in an orderly and law abiding fashion on Park Avenue, carrying signs and wearing buttons protesting the RNC. Without warning or any order to disperse, the plaintiffs, which includes both those participating in this particular march as well as others who just happened to be in the area, were arrested. At no time were they given an order and/or a meaningful opportunity to disperse or advised that they were in violation of any law or ordinance of the State or City of New York. Plaintiffs WENDY STEFANELLI and STACY COTLER, both pedestrians, were arrested at or near this location. Defendants Captain DERMOT SHEA and Sergeant MICHAEL INGRAM supervised, and were in whole and/or in part responsible for, the policing of events on Park Avenue between 26th and 27th Streets, including the arrest of plaintiffs STEFANELLI and COTLER. Defendant P.O. MELISSA ROMAN-DE LACY was assigned as the plaintiffs' arresting officer. Following their arrests, the plaintiffs were

33

transported to Pier 57 where they were detained before being taken to Central Booking for arraignment before a judge.

J.      On August 31, 2004, the defendants again employed the indiscriminate mass arrest policy to arrest individuals who were participating in, observing, or were merely in the vicinity of a march proceeding west on 35th Street between Fifth Avenue and Sixth Avenue. The protesters and others were walking in the street and on the sidewalk of 35th Street, which was closed to vehicular traffic between Fifth and Sixth Avenues. As these individuals traveled west toward Sixth Avenue, they were confronted by a line of police across 35th Street under the command of defendant Lt. JOHN WOLF and were told that they could go no further. When they turned around to leave whence they had come, they were again blocked off by a line of police with scooters. These police actions were ordered and directed by defendants BRUCE SMOLKA and ANTHONY BOLOGNA. After a period of time waiting, trapped on 35th Street, the individuals in the street were instructed by police to get onto the sidewalk. They complied. All individuals on 35th Street between Fifth and Sixth Avenues were then arrested, at the decision and direction of defendant SMOLKA. At no time were the individuals on 35th Street given an order or opportunity to disperse or advised that they were in violation of any law or ordinance of the State or City of New York. Plaintiffs JASON BARRUS, WILLIAM HOBBS and SHAHRZAD GHAHREMANI-GHADJAR and members of the plaintiff class were arrested at this location. Defendants P.O. JOHN WOODS, P.O. NEIL RODRIGUEZ and P.O. JOHANNA GREENBERG-MCMINN were assigned as the plaintiffs' respective arresting officers. Following their arrests, the plaintiffs and other members of the plaintiff class arrested at this location were transported to Pier 57, where they were detained before being taken to Central Booking for arraignment before a judge.

K.      Again, on August 31, 2004, the defendants employed the indiscriminate mass arrest

34

policy to arrest individuals who were participating in, observing, or were merely in the vicinity of a demonstration relating to the RNC. This demonstration occurred at the southeast corner of the intersection of Broadway and 34th Street. Individuals at that location were standing on the sidewalk, behind police barricades. At the decision of defendant Deputy Chief STEPHEN PARAGALLO, everyone at that location, including plaintiffs NOAH CHARNEY and RACHEL HEINOLD, was surrounded and arrested. Defendant Sergeant RAFFI OVANESSIAN supervised, and was in part responsible for, the policing of events on Park Avenue between 26th and 27th Streets, including the arrest of plaintiff HEINOLD. Defendants P.O. ROSE-HINKSMAN and P.O. CHUNG were assigned as the plaintiffs' respective arresting officers. At no time were the individuals at the intersection of Broadway and 34th Street given a lawful order to disperse and/or a meaningful opportunity to disperse or advised that they were in violation of any law or ordinance of the State or City of New York. Following their arrests, the plaintiffs were transported to Pier 57 where they were detained before being taken to Central Booking for arraignment before a judge.

      L.     Again, on August 31, 2004, the defendants employed the indiscriminate mass arrest policy to arrest individuals who were participating in, observing, or were merely in the vicinity of a demonstration relating to the RNC. This demonstration occurred on or around the mezzanine of the New York Public Library on Fifth Avenue between 42nd Street and 40th Street. At the decision of defendant Deputy Chief O'NEILL, police unlawfully ordered demonstrators, bystanders and library patrons to leave the area on or around the steps of the Public Library. Plaintiff CHRISTOPHER THOMAS, a Canadian resident who was visiting New York with his son and was not participating in the demonstration, was arrested by defendant Captain RONALD MERCANDETTI for making an observation to MERCANDETTI. P.O. KEVIN SCOTT was assigned as THOMAS's arresting officer. At no time was

35

plaintiff THOMAS violating any order by the police or any law or ordinance of the State or City of New York. Indeed he was complying with such an order. Following his arrest, THOMAS was transported to Pier 57 where he was detained before being taken to Central Booking for arraignment before a judge.

75.     The mass arrest policy utilized by the defendants just before and during the RNC substantially chills the exercise of First Amendment rights. When the police arrest large numbers of people engaged in lawful activity at or near demonstrations, those arrested are far less likely to be comfortable engaging in future protest activity. Moreover, when such arrests take place at such a highly publicized event as the RNC, the public at large is given the message that participation in protest activity is criminal and likely to lead to arrest. This "criminalization" of dissent and protest lies at the heart of the defendants' mass arrest policy and the other policies alleged herein.

### The Conditions of Confinement Were Cruel and Inhumane

76.     During the RNC, defendants CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO, COLGAN and ROEs 1-50 implemented policies, practices or customs of detaining the plaintiffs, and members of the plaintiff class, without justification, in conditions that were deliberately indifferent, cruel, inhumane, unhealthy and dangerous.

77.     Defendants' deliberate course of conduct included the use of Pier 57, a facility completely unfit for human occupancy, as the Post Arrest Staging Site ("PASS") exclusively for RNC protesters and those arrested in the vicinity of RNC protests. Located on the west side of Manhattan, Pier 57 had been used until September 7, 2003 by the Metropolitan Transit Authority ("MTA") as a storage and repair facility for City buses, after which time it sat empty and unused until the RNC. An environmental report prepared by Ove Arup & Partners Consulting Engineers PC in April of 2004 stated that Pier 57's "electrical and life safety systems have code deficiencies, are in poor physical conditions and in need of

36

standards for the management of correctional facilities and evaluating, investigating and overseeing correctional facilities. The NYPD refused to allow SCOC monitors inside Pier 57 which, upon information and belief did not comply with or meet minimum standards for New York correctional facilities.

### The Policy to Excessively Detain People Arrested for Minor Offences

91.    During the RNC, defendants CITY OF NEW YORK, BLOOMBERG, KELLY, COHEN, ESPOSITO, HAMMERMAN, DOEFPNER, MARIN-JORDAN, SWEET, GRAHAM, SMOLKA, MONAHAN, COLGAN, MCMANUS and ROEs 1-50 implemented a policy, practice or custom of detaining the plaintiffs, and members of the plaintiff class, without justification, for unnecessary and prolonged periods of time, thereby preventing them from participating in further demonstration or protest activity, or from simply going on with their lives. In particular, the defendants implemented arrest procedures which were intended to, and did in fact, unreasonably prolong and extend the period of time that plaintiffs, and those similarly situated, would be held in custody following their arrests. These procedures included, *inter alia*, the adoption of a "no summons" policy under which everyone arrested in connection with an actual or perceived RNC protest event, no matter how minor the infraction, would be subject to a custodial arrest, rather than being issued a summons on the street; the fingerprinting of all those arrested, even for minor offences for which fingerprinting is unnecessary; the use of Pier 57 as the Post Arrest Staging Site ("PASS") without fingerprinting or LiveScan capability; the detailed listing of the possessions of all those arrested, with everything being, in the words of defendant COLGAN "itemized, line by line" (which first required the arresting/assigned offices to cull through large piles of arrestees' belongings to locate their arrestees' property); having counsel from the NYPD's Legal Bureau review each arrest and assist in the preparation of the arresting officers' memo book entries and on-line

41

booking worksheets before the paperwork was sent to the Office of the District Attorney, including instructing arresting officers to create false accounts of the plaintiffs' and plaintiff class members' arrests; repeatedly moving the arrestees from cage to cage at Pier 57, then from Pier 57 to Central Booking, and finally from cell to cell within Central Booking; and requiring that the results of a criminal background check from both New York State Division of Criminal Justice Services ("DCJS") and the Federal Bureau of Investigation ("FBI") had to be received by the Manhattan Court Section before each arrestee could be arraigned. All these procedures were intended to, and did, unnecessarily and unreasonably extend and prolong the period of time that plaintiffs, and those similarly situated, were held in custody.

92.    Rather than use existing facilities, such as Old Central Booking, the Brooklyn Navy Yard, or the numerous precincts throughout the City-- including the at least twenty (20) precincts in Manhattan, all of which are capable of adequately processing arrestees -- as the Post Arrest Staging Site for people arrested during the relevant period, or utilizing existing and long-standing early custodial release policies, defendants deliberately chose to detain RNC arrestees at Pier 57, a facility that lacked any equipment, such as LiveScan machines, for taking and transmitting fingerprints, which would have permitted the processing and arraignment of individuals immediately following their arrest. Without such fingerprinting capability, and given defendants' policy of fingerprinting everyone arrested no matter how minor the alleged offence, the multi-step process of taking the fingerprints, transmitting them to DCJS and awaiting the results of criminal background checks conducted by both DCJS and the FBI could not even begin until RNC arrestees were transported from Pier 57 to 125 White Street/MAPC, where their fingerprints could be taken. As a result, the plaintiffs, and those similarly situated, were detained for lengthy and unnecessary periods of time for no justifiable or legitimate reason.

42

93.    Moreover, the overwhelming majority – i.e., 1400-plus – of the 1,800 people who were arrested during the period just before and during the RNC were detained for only violations, such as disorderly conduct and parading without a permit. New York Criminal Procedure Law § 160.10 does not require an arrestee accused of committing a violation to be fingerprinted prior to release from custody with a summons or a Desk Appearance Ticket, unless the arrestee lacks valid identification. The defendants' decision not to issue any summons and to fingerprint all persons arrested in connection with an RNC protest event, without consideration for the level of offence charged and whether the arrestee possessed valid identification, resulted in excessive delays in RNC arrestees' release and the improper entry of their fingerprints into City, state and federal government databases.

94.    The unconstitutional arrests of large numbers of individuals who were not in violation of any law or regulation of the State or City of New York, were designed to create a pretext for the lengthy and punitive detentions of people arrested.

95.    Further evidence of the defendants' policies, practices and custom of excessively detaining individuals arrested during the RNC is found in the defendants' willful and deliberate defiance of the decisions of, not one, but two New York State Supreme Court justices during the RNC. The defendants faced criminal and civil contempt proceedings before one of those judges for their willful and deliberate defiance of a lawful court order.

96.    Following the arrests of people prior to and during the RNC, the defendants implemented a policy and procedure of refusing those individuals access to counsel. In response, a proceeding was brought in New York State Supreme Court to obtain access. On September 1, 2004, the Honorable Emily Jane Goodman issued an order directing defendant CITY to allow defense lawyers access to their clients "forthwith." Despite this clear directive, defendant CITY and its agents willfully and deliberately

43

continued to deny lawyers access to the plaintiffs and those similarly situated, then in the CITY's custody.

97.     Because of the extended periods of time those arrested on August 31, 2004 had been detained, a second state judge, Acting Supreme Court Justice John Cataldo, ordered defendant CITY to either bring demonstrators before the court or release them. After defendant CITY failed to comply, the judge held the CITY in contempt for failing to release or have ready for arraignment approximately 560 people. The contempt proceedings continued for many months after the RNC and were eventually settled.

98.     One of the defendants' pretexts for the preventive detentions and unnecessary delays during the RNC has been that it took "five or six hours to get the fingerprints from Albany," referring to criminal history records maintained by DCJS. In fact, DCJS sent 94 percent of the fingerprint reports to the CITY in one hour or less. Only one set of fingerprints -- of the 3,620 processed by the state from August 30, 2004 to September 3, 2004 -- took as long as five hours to return to New York City authorities.

99.     The policies, practices or customs of defendants CITY OF NEW YORK, BLOOMBERG, KELLY, G. MCCARTHY, COHEN, HAMMERMAN, DOEPFNER, MARIN-JORDAN, ESPOSITO, ESTAVILLO, GRAHAM, SMOLKA, MONAHAN, COLGAN, MCMANUS, SCAGNELLI, PARAGALLO, O'NEILL, ESSIG, GALATI, DIECKMANN, J. SHEA, DIRUSSO, BOLOGNA, MCCARTHY, WARD, SWEET, HUGHES, HYLAND, C. MONAHAN, JASKARAN, MERCANDETTI, TRACEY, DOWLING, CROSSAN, D. SHEA, KEEGAN, WOLF, INGRAM, ROMAN, MYERS, OVANESSIAN, WOODS, MCSWEENEY, REYES, PHILLIPS, NELSON, NOEL RODRIGUEZ, NEIL RODRIGUEZ, ROSE-HINKSMAN, FILOSETA, SAM, RIGGAN, BOYLE,

44

BALICKI, GREENBERG-MCMINN, MARTINOFF, MASON, SCOTT, SUERO, BAITY, CHUNG, SHANNON, HAMLIN, M. ROMAN-DE LACY, ROEs 1-50 and DOES 1-50 of making indiscriminate mass arrests of persons lawfully participating in or observing demonstrations, of detaining those arrested on minor offences for prolonged and excessive periods of time, and of detaining them in conditions which were unhealthy and unsafe and which were not suitable for the detention of prisoners, violated the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, their counterpart provisions in the New York State Constitution, and New York statutory and common law. In addition to declaratory and injunctive relief against the defendants' unconstitutional policies and practices as outline above, the plaintiffs, and those they seek to represent, request compensatory and punitive damages for the emotional and physical injuries they suffered which were proximately caused by the defendants' unconstitutional conduct, and an award of attorneys fees and costs.

## Facts Applicable to the Named Plaintiffs

### Plaintiff Carolyne Ali-Khan

100.    Plaintiff CAROLYNE ALI-KHAN is a high-school teacher in New York City. She was arrested on August 29, 2004 at approximately 11:30 a.m., on 37th Street between Broadway and 6th Avenue. At the time of her arrest, ALI-KHAN was not violating any law or order from a police officer. Her arrest was without any cause, let alone probable cause. She was held for approximately 28-29 hours.

101.    On this particular Saturday, ALI-KHAN was roller-blading for recreation and exercise along 6th Avenue. She found herself amongst a group of bicyclists. When she got to 37th Street, she headed east, where she and others with her were penned in by NYPD police officers. They were ordered onto the sidewalk.

102.    Shortly thereafter, ALI-KHAN was handcuffed and arrested by defendant Police Officers

45

GEORGE SHANNON and COURTNEY HAMLIN and her rollerblades were confiscated. Her arrest was ordered by defendant Captain JOSEPH DOWLING and approved by defendant Inspector JAMES SHEA. Based on a false criminal complaint signed under penalty of perjury by defendant P.O. SHANNON and with the knowledge and approval of his supervisors, ALI-KHAN was charged with parading without a permit and disorderly conduct, notwithstanding the complete absence of any cause, let alone probable cause, to arrest her for these or any other criminal charges.

103.    Following her arrest, ALI-KHAN remained handcuffed for hours, causing extreme pain, discomfort and numbness. She was transported to Pier 57 where she was herded into cold, overcrowded wire cages for many hours and where she had to sit or lie on the floors, which were contaminated and filthy, in order to rest or sleep. Due to these conditions, she experienced respiratory problems and flu-like conditions. She was also denied adequate toilet and sanitary facilities. At Pier 57, she was also denied the right to contact her family or an attorney concerning her arrest.

104.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, ALI-KHAN has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

### Plaintiff Jason Barrus

105.    Plaintiff JASON BARRUS is a packaging design engineer who resides in the City of New York. He was arrested on August 31, 2004, approximately between 8:00 - 9:00 p.m., on 35th Street between Sixth and Fifth Avenues. At the time of his arrest, BARRUS was not violating any law or order from a police officer. His arrest was totally without any probable cause. He was held for approximately 46 hours.

106.    On the day of his arrest, BARRUS arrived in the Herald Square vicinity to lawfully and

46

peacefully protest the RNC. The plaintiff was walking west on 35th Street heading from Fifth Avenue to Sixth Avenue. This block of 35th Street was closed to vehicular traffic. A line of NYPD police officers, under the supervision of defendant Lt. JOHN WOLF and containing some of the DOE and ROE defendants headed east on 35th Street from Sixth Avenue, ahead of him. At no time did police instruct or direct the plaintiff and others on 35th Street to disperse. The line of officers were pushing plaintiff and others east, so the plaintiff turned around and began retracing his steps back toward Fifth Avenue. When he got about two-thirds of the way down the block toward Fifth Ave, another line of police officers and supervisors, including some of the DOE and ROE defendants, blocked 35th Street with a line of mopeds. Plaintiff and others on 35th Street attempted to leave the block. However, police would not allow the crowd to do so. These NYPD actions on 35th Street, ordered by defendants BRUCE SMOLKA and ANTHONY BOLOGNA, created a pincer effect, causing the crowd to become tightly congested, creating a dangerous situation. Once BARRUS and the others on 35th Street were surrounded, they were not allowed to leave even though BARRUS asked to do so.

107.    Shortly thereafter, BARRUS was handcuffed by one of the DOE defendants. P.O. JOHN WOODS was later assigned as plaintiff's "arresting officer." BARRUS and others on 35th Street were arrested at the decision and order of defendants BRUCE SMOLKA. BARRUS was never told he was going to be arrested, nor was he given a reason for his arrest. BARRUS was charged with disorderly conduct, notwithstanding the complete absence of any cause, let alone probable cause, to arrest him for this or any other criminal charges. Further, defendant Sgt. RONALD MYERS, who signed the false criminal complaint against BARRUS under penalty of perjury, never saw the plaintiff engage in any of the alleged acts, notwithstanding that he attested to the fact that he had.

108.    Following his arrest, BARRUS was subjected to excessively tight handcuffing, for many

47

hours, causing numbness, pain, and discomfort. The tight handcuffs caused bruising and broke the skin on both of the plaintiff's wrists. He was transported to Pier 57 where he was herded into overcrowded wire cages for many hours and where he had to sit or lie on the floor in order to rest or sleep. He was denied access to water and food. Because of the conditions he was detained under, BARRUS was unable to eat or sleep. He was also denied adequate toilet and sanitary facilities. In addition, the plaintiff was taken to the hospital emergency room during his confinement because police denied him access to his medication to treat an existing eye condition. Due to this, and to exposure to the toxic dirt particles at Pier 57, the plaintiff's eye condition worsened.

109.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, BARRUS suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

### Plaintiff Erika Biddle

110.    Plaintiff ERIKA BIDDLE is employed as an editor and proofreader and is also a freelance videographer and video editor. She was arrested on August 31, 2004, at approximately 7:00 p.m. on 16th Street between Union Square East and Irving Place. At the time of her arrest, BIDDLE was not violating any law or order from a police officer. Her arrest was totally without any probable cause. She was held for approximately 50-52 hours.

111.    During the RNC, and on August 31, 2004, BIDDLE volunteered as a legal observer at protests. Her duties primarily consisted of observing and videotaping the protest activities and interactions between the protesters and the police. On the evening in question she received a phone call requesting that she go and observe activities in the Union Square area. When she arrived, she commenced videotaping a large group of people in the vicinity of a marching band on 16th Street. On

48

16th Street between Union Square East and Irving BIDDLE was surrounded by police officers and prevented from leaving the area as the NYPD, at the decision of defendants Lt. MARK KEEGAN and Inspector JAMES ESSIG, had blocked off 16th Street at Irving Place and at Union Square East.

112.    Shortly thereafter, BIDDLE was handcuffed by one of the DOE/ROE defendants, who had no cause whatsoever to arrest her, let alone probable cause. Defendant Police Officer DERRICK BAITY was assigned as plaintiffs arresting officer. Notwithstanding that defendant BAITY admits that he first saw BIDDLE after she was already in handcuffs, he swore, with the knowledge and approval of his supervisors, under penalty of perjury on her criminal complaint that he had personally observed her engage in alleged illegal conduct that he did not observe and which BIDDLE did not commit.

113.    Following her arrest BIDDLE was subjected to excessively tight handcuffing, which caused numbness, pain, discomfort, discoloration and injury to her wrist. She was transported to Pier 57 where she was herded into overcrowded wire cages where she was held for many hours with nowhere to sit or lie, other than on the filthy, oily floor. As a consequence BIDDLE stood throughout the many hours that she was housed at Pier 57. Since BIDDLE's right leg is partially amputated, this imposed a great strain on plaintiff's residual limb which resulted in swelling and/or edema.

114.    Further, as a result of BIDDLE's perceived disability, she was subjected to degrading and humiliating actions on the part of the defendants and their agents, including but not limited to, derogatory remarks, such as being referred to as a "crip," a more intrusive and aggressive personal search and pat-down, and isolation from other detainees. Because the floor and walls were contaminated and filthy, BIDDLE developed dermatitis and/or chemical burns on and around her face. She was also denied adequate toilet and sanitary facilities.

115.    As a direct and proximate result of the defendants' wrongful policies, practices, customs

49

and/or usages complained of herein, BIDDLE has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

### Plaintiff Michael Binder

116. Plaintiff MICHAEL BINDER is a medical student but at the time of his arrest was a high-school teacher. He was arrested on August 27, 2004, at approximately 8:00 p.m., at the corner of 35th Street and 7th Avenue. At the time of his arrest, BINDER was not violating any law or order from a police officer. His arrest was without probable cause. He was held for approximately 16-20 hours.

117. On August 27, 2004, BINDER and his girlfriend were riding their bikes with a group of other cyclists in Manhattan. As they traveled south on 7th Avenue, they came to a red light at 35th Street. BINDER and his girlfriend stopped at the light. BINDER observed NYPD police officers arresting a number of bicyclists in the intersection. Defendants BRUCE SMOLKA, Inspector ANTHONY BOLOGNA, Inspector JOHN HUGHES, Captain WILLIAM J. TRACEY, Captain MATTHEW HYLAND, Captain CHRIS MONAHAN and Captain JASKARAN supervised, and were in whole and/or in part responsible for, the policing operations on Seventh Avenue between 34th and 35th Streets.

118. As BINDER waited at the light, he took out his camera and took a picture of the intersection.

119. As soon as BINDER took his photograph of NYPD officers arresting cyclists, approximately three DOE/ROE defendants came up to him, including upon information and belief, defendant P.O. REYES and/or defendant P.O. MCSWEENEY, forcibly removed him from his bike, forced him to the ground and handcuffed him. BINDER's arrest was ordered by a defendant ROE supervisor. BINDER's bike was confiscated. Based on a false criminal complaint sworn to under penalty of perjury by Defendant Police Officer BRIAN MCSWEENEY (Shield No. 31411) with the

50

knowledge and approval of his supervisors, BINDER was charged with parading without a permit and disorderly conduct, notwithstanding the complete absence of any cause, let alone probable cause, to arrest him for these or any other criminal charges.

120. Following his arrest, BINDER remained handcuffed for several hours. He was transported to Pier 57 where he was herded into overcrowded wire cages for many hours and where he had to sit or lie on the contaminated and filthy floors in order to rest or sleep. He was denied adequate toilet and sanitary facilities. He was also denied the right to contact his family or an attorney concerning his arrest.

121. BINDER was taken from Pier 57 to 100 Centre Street where he was fingerprinted and booked. While at 100 Centre Street, he was verbally harassed by NYPD officers who repeatedly referred to him and other arrestees as "liberal scum."

122. As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, BINDER has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

## Plaintiff Sonia Chandra

123. Plaintiff SONIA CHANDRA, at the time of her arrest, was a production assistant for a magazine. She was arrested on August 31, 2004, at approximately 7:00 p.m. on 16th Street between Union Square East and Irving Place. At the time of her arrest, Chandra was not violating any law or order from a police officer. Her arrest was without any cause, let alone probable cause. She was held for approximately 35-40 hours.

124. On the evening of her arrest, CHANDRA had left work to meet her friend, plaintiff CELINE MALANUM, and proceed to the Union Square area for dinner and a drink. When CHANDRA

51

and MALANUM arrived at Union Square, they entered Union Square Park to observe the activity there. While in the park, CHANDRA heard a band playing as its members traveled north on Union Square East. CHANDRA and MALANUM, walked north on Union Square East and turned east onto 16th Street to observe the band. There were several hundred people peacefully protesting or observing on the same block. When CHANDRA reached the end of the block at Irving Place, she was stopped by a line of DOE and ROE defendants on motor scooters, blocking her way and refusing to allow her to proceed. These officers directed her back toward the Union Square East end of the block. CHANDRA complied, only to find the street was barricaded at Union Square East by more DOE/ROE defendants, who were under the direction and supervision of defendant Lt. MARK KEEGAN. She and other members of the plaintiff class were ordered to sit on the sidewalk, where, at the decision and direction of defendant Inspectors JAMES ESSIG and GERALD DIECKMANN, they were handcuffed. Defendant Inspector THOMAS GALATI approved this arrest decision. There was no cause, let alone probable cause for CHANDRA's arrest. Defendant P.O. KEVIN SAM was assigned as CHANDRA's arresting officer. He falsely swore under penalty of perjury and with the knowledge and approval of his supervisors that he personally observed CHANDRA engage in illegal conduct which he did not witness and which she did not commit.

125.    Following her arrest, CHANDRA was subjected to excessively tight handcuffing for many hours, causing numbness, pain, and extreme discomfort. She was transported to Pier 57 where she was herded into cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep. Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals and dirt. She was also denied adequate toilet and sanitary facilities. Upon leaving Pier 57, she was transported to Central Booking, where she was again

subjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort. Further, during the time she was in custody, she was subjected to harassment, including sexual harassment, by defendants DOEs and ROEs.

126.    In addition, CHANDRA was denied medical care and medication for her chronic asthma condition. As a result of being denied an inhaler, she had extreme difficulty breathing for many hours and eventually suffered an asthma attack while at Central Booking.

127.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, CHANDRA has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

### Plaintiff Noah Charney

128.    Plaintiff NOAH CHARNEY at the time of his arrest was a physics teaching fellow at Amherst College. He was arrested on August 31, 2004 at approximately 8:30 to 9:30 p.m. at the southeast corner of 34th Street and 6th Avenue. At the time of his arrest, Charney was not violating any law or lawful police order. His arrest was totally without any probable cause. He was held for approximately 48 hours.

129.    At the time of his arrest plaintiff CHARNEY was standing on the sidewalk and was not blocking any vehicular or pedestrian traffic. At all times, he was attempting to comply with the law. Defendant Deputy Chief STEPHEN PARAGALLO made the decision that everyone on the corner where plaintiff was standing was to be arrested. Defendant Captain CROSSAN directed his officers to make these arrests and supervised them in doing so. Plaintiff was arrested by defendant Police Officer JAMES CHUNG, who at no time had any cause whatsoever to arrest CHARNEY, let alone probable cause. Defendant P.O. CHUNG falsely swore to a criminal complaint attesting that he personally observed

53

CHARNEY engage in illegal conduct, which CHUNG admits he did not observe and which CHARNEY did not commit.

130.    Following his arrest, CHARNEY was subjected to excessively tight handcuffing for many hours, causing numbness, pain, and extreme discomfort. He was transported to Pier 57 where he was herded into cold, overcrowded wire cages for many hours and where he had to sit or lie on the floor in order to rest or sleep. Given the filthy condition of the floor and walls, he was forced to have contact with and to breathe in potentially hazardous chemicals. He was also denied adequate toilet and sanitary facilities.

131.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, CHARNEY has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

### Plaintiff Stacy Cotler

132.    Plaintiff STACY COTLER works for a Jewish oriented foundation in New York City. She was arrested on August 31, 2004, at approximately 8:30 p.m., on Park Avenue at or near 27th Street. At the time of her arrest, Cotler was not violating any law or order from a police officer. Her arrest was totally without any probable cause. She was held for approximately 45 hours.

133.    Before her arrest, COTLER was walking with three friends on the sidewalk on Park Avenue when they observed numerous police officers running down the street. COTLER and her friends stopped to ascertain and observe the situation, but quickly became afraid of the police, who were acting aggressively toward them for no reason. In an attempt to avoid any confrontation, COTLER and her friends, along with several other pedestrians, stepped into the doorway of a nearby building. Without any basis for suspecting that COTLER or the others in the doorway were

54

engaging or were about to engage in criminal activity, defendant NYPD DOE/ROE officers surrounded them and began violently shoving them. An NYPD Supervisor ROE ordered Cotler and the others to go, yelling at them to "get the fuck out." When COTLER and the others attempted to comply with the supervisor's order and move away from the doorway, defendant NYPD DOE/ROE officers began pushing and shoving them, forcing COTLER and the others to return to the doorway area. As they moved back toward the doorway, one of the DOE/ROE defendants hit COTLER several times with a night stick. The NYPD ROE Supervisor yelled again at them, "Get the fuck out of here." As COTLER and the others again attempted to comply with the supervisor's orders a second time by moving away from the doorway, the defendant DOE/ROE officers began pushing them back and blocking them in. Upon being ordered again by an NYPD supervisor ROE to let the individuals leave, the DOE/ROE officers simply continued their wholly unjustified battery of COTLER and the others. One DOE/ROE officer grabbed COTLER by the hair, **pulled** her to the ground, and handcuffed her. There was absolutely no cause, let alone probable cause, for her arrest, and the force used against her was unreasonable and excessive given the circumstances then and there prevailing.

134.    The criminal complaint against COTLER states that defendant P.O. MELISSA ROMAN was informed by defendant Sergeant MICHAEL INGRAM that COTLER engaged in conduct which provided the alleged probable cause for her arrest. Neither ROMAN, as she admits, nor INGRAM observed COTLER violate any law or regulation of the State or City of New York, nor did COTLER do so. Defendant Captain DERMOT SHEA and Sergeant MICHAEL INGRAM supervised, and were in whole and/or in part responsible for, the policing of events on Park Avenue between 26th and 27th Streets, including the arrest of plaintiff COTLER.

55

135.    Following her arrest, COTLER was subjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort. She was transported to Pier 57 where she was herded into cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep. Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals. She was also denied adequate toilet and sanitary facilities.

136.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, COTLER has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

### Plaintiff Kate Esposito

137.    At the time of her arrest, plaintiff KATE ESPOSITO, was a 50-year-old counselor at a women's shelter. She was arrested on August 31, 2004 on Broadway just south of 28th Street. She was held for approximately 45 -50 hours.

138.    Unlike almost all of the plaintiffs and class members, plaintiff KATE ESPOSITO was engaging in civil disobedience at the time of her arrest. She was lying down in the street, intentionally obstructing traffic in order to convey her message of opposition to the RNC and the policies of the Bush administration. She agrees that there was probable cause to arrest her. Nonetheless, she was held far longer than was necessary or reasonable, and in cruel and inhumane conditions, as part of defendants' policies, practices and custom of punishing peaceful political protest.

139.    Following her arrest by Police Officer Travis Ross (Shield No. 03572), plaintiff ESPOSITO was subjected to tight handcuffing, for many hours, causing numbness, pain, and

56

extreme discomfort. She was transported to Pier 57 where she was herded into overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep. Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals and dirt. She was also denied adequate toilet and sanitary facilities.

140.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, plaintiff KATE ESPOSITO has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

### Plaintiff Elizabeth Fleischman

141.    Plaintiff ELIZABETH FLEISCHMAN is a former vice president at Morgan Stanley, and a survivor of the World Trade Center attack. She was arrested on August 27, 2004 at approximately 9:30 p.m. on 35th Street, between Tenth Avenue and Dyer. Her arrest was totally without any probable cause. She was held for approximately 20 hours.

142.    On August 27, 2004, FLEISCHMAN had decided to participate, as she had done on several occasions in the past, in the Critical Mass bike event which takes place on the last Friday of every month. She rode in the event on an average of three times per year. Although the event in August 2004 had a political tone to it because of the RNC, it was, as always, an event to heighten awareness to alternative forms of transportation. At no time in the past had FLEISCHMAN ever experienced any problems with the police when participating in this event. The bike event started at approximately 7:30 p.m. in Union Square. One and one-half hours later, at approximately 9:00 p.m., FLEISCHMAN and approximately 200 other riders were directed by police to head west on 35th Street. During the prior one and one-half hours the plaintiff was not informed by the police that the assembly she was involved in was illegal nor was she informed that she should discontinue her

57

participation in that event. In fact, the police had directed plaintiff and the other bicyclists to take certain routes and to follow certain instructions. Plaintiff and the other cyclists consistently complied with those directions and instructions.

143.    Shortly after FLEISHMAN and the other cyclists were directed onto 35th Street between 10th Avenue and Dyer, the police barricaded both the entrances and exits to 35th Street at both 10th Avenue and Dyer, thus preventing plaintiff and others from leaving the scene. Shortly thereafter, at the decision of defendant Inspector GERALD DIECKMANN, plaintiff and the other cyclists trapped on 35th Street were arrested. The plaintiff was handcuffed, her bicycle was confiscated, and she was transported to the detention facility at Pier 57. Defendant P.O. ANTHONY MASON, although he did not personally witness FLEISCHMAN violate any laws, was assigned as her arresting officer and later falsely swore, under penalty of perjury and with the knowledge and approval of his supervisors, to plaintiff's criminal complaint, claiming he personally observed her engage in unlawful activity that he did not witness and plaintiff did not commit.

144.    Following her arrest, FLEISCHMAN remained handcuffed for many hours, causing pain and discomfort. At Pier 57 she was herded into cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep. Because the floor and walls were contaminated and filthy, Fleischman was exposed to what she fears may be some illness related to exposure to toxic chemicals and substances. She was denied adequate toilet and sanitary facilities.

145.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, FLEISCHMAN has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

58

### Plaintiff Emily Friedman

146.     EMILY FRIEDMAN, at the time of her arrest, was a 16-year-old student at Fiorello H. LaGuardia High School of Music & Art and Performing Arts in Manhattan. FRIEDMAN was arrested on August 31, 2004, between 7:00 and 8:00 p.m., on 16th Street between Union Square East and Irving Place. At the time of her arrest, FRIEDMAN was not violating any law or order from a police officer. Her arrest was totally without any probable cause. She was held for approximately 45-50 hours.

147.     Along with scores of other individuals, including those protesting the RNC as well as observers and bystanders, all of whom were peacefully gathered in the area, EMILY FRIEDMAN was trapped on 16th Street between Union Square East and Irving Place by lines of DOE/ROE defendants at either end of the block, acting at the decision and order of defendants Lt. MARK KEEGAN and Inspector JAMES ESSIG. FRIEDMAN and others were ordered to sit on the sidewalk, and, at the decision of defendants ESSIG and Inspector GERALD DIECKMANN, were arrested. This arrest decision was approved by defendant Inspector THOMAS GALATI. There was absolutely no cause, let alone probable cause, for her arrest.

148.     FRIEDMAN was handcuffed by defendant P.O. NOEL RODRIGUEZ (Shield No. 09310), who swore under penalty of perjury in plaintiff's criminal complaint that he observed the plaintiff engage in illegal conduct, which RODRIGUEZ did not observe and which the plaintiff did not commit.

149.     Following her arrest, FRIEDMAN was subjected to excessively tight handcuffing for many hours, causing numbness, pain, extreme discomfort, and injury to her wrists and shoulder. She

was transported to Pier 57 where she was herded into cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep. Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals and dirt, and suffered rashes. She was also denied adequate toilet and sanitary facilities. Her repeated requests to contact her parents were denied.

150.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, EMILY FRIEDMAN has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

**Plaintiff Shahrzad Ghahremani-Ghadjar**

151.    Plaintiff SHAHRZAD GHAHREMANI-GHADJAR was, at the time of her arrest, a 15-year-old high school student. She was arrested on August 31, 2004, approximately between 8:30 and 9:00 p.m., on 35th Street between Fifth and Sixth Avenues. At the time of her arrest, Ghahremani was not violating any law or order from a police officer. Her arrest was totally without any probable cause. She was held in custody for approximately four hours.

152.    At the time of her arrest, GHAHREMANI-GHADJAR was on her way to a movie with a friend. The movie was playing at a theater on 34th Street between 8th and 9th Avenues. When GHAHREMANI-GHADJAR and her friend arrived at 34th Street and 6th Avenue they observed a group of protesters on the sidewalk. When she asked a police officer where she could go to avoid the protest, she was directed to walk to 5th Avenue and then north to 35th Street. She was further instructed to walk west on 35th, to get to the movie. However, when she and her friend were between 5th and 6th Avenues on 35th Street, they were trapped by groups of NYPD officers at each end of 35th Street, acting under the order of defendants BRUCE SMOLKA and ANTHONY BOLOGNA. When

60

they attempted to leave, defendant DOE/ROE officers refused to allow them to disperse. At the decision and order of defendant SMOLKA, plaintiff and everyone trapped on 35th Street was arrested. P.O. JOHANNA GREENBERG-MCMINN was GHAHREMANI-GHADJAR's arresting officer.

153.    Following her arrest, GHAHREMANI-GHADJAR was subjected to harassing remarks by NYPD officers on 35th Street and excessively tight handcuffing. She was transported to Pier 57 where she was herded into cold, overcrowded wire cages. While at Pier 57, GHAHREMANI-GHADJAR was denied medical care or attention, despite the fact that as a diabetic she needed to check her insulin. Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals. She was also denied adequate toilet and sanitary facilities.

154.    GHAHREMANI-GHADJAR was taken from Pier 57 to a juvenile detention facility where she was released to her father. While at the detention facility she was subjected to xenophobic remarks about her Iranian heritage by, upon information and belief, defendant P.O. GREENBERG-MCMINN. Plaintiff was never charged with a crime or violation and there was absolutely no cause, let alone probable cause for her arrest.

155.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, GHAHREMANI-GHADJAR has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

### Plaintiff Simon Harak

156.    Plaintiff SIMON HARAK is a Jesuit Priest. He was arrested on August 31, 2004, between approximately 4:00 and 4:30 p.m. at Fulton Street near the site of the former World Trade

61

Center. At the time of his arrest, HARAK was not violating any law or order from a police officer. His arrest was totally without any probable cause. He was held for approximately 20-25 hours.

157.    On August 31, 2004, Father HARAK was an active member of the War Resisters League. In that capacity, he and others had planned and announced a vigil at the site of the World Trade Center for the afternoon of August 31, 2004. After that vigil, the group planned to walk north on Broadway to the vicinity of the RNC, where they planned to engage in further protest against the domestic, foreign and military policies of the Bush government. The group held its vigil at the site of the World Trade Center and then assembled on Fulton Street to march up Broadway. Prior to beginning any march, the demonstrators negotiated with and were specifically told by NYPD officers and supervisors, including defendant Inspector THOMAS GALATI, that they would be allowed to march north from Fulton Street and Broadway toward Madison Square Garden, the site of the RNC, so long as the participants did not block traffic and obeyed the traffic signals at intersections. A videotape of the event specifically shows police officials informing demonstrators that the march could precede in the fashion described above.

158.    Almost immediately after the march began and before it had even proceeded one full block, NYPD officers and supervisors, on the orders of defendant Assistant Chief TERENCE MONAHAN, halted the march, surrounded over 200 people utilizing the mesh nets, and arrested them all, even though they had remained on the public sidewalk, were not blocking the sidewalk, and had made every effort to comply with police instructions. The decision to arrest was made by defendants MONAHAN and GALATI. Those arrested were given no orders and/or meaningful opportunity to disperse. At the time that plaintiff HARAK was arrested by defendant police officer MICHAEL FILOSETA, there was absolutely no cause, let alone probable cause, to arrest him.

62

Notwithstanding, defendant FILOSETA swore under penalty of perjury and with the knowledge and approval of his supervisors to a criminal complaint attesting he had personally observed HARAK engage in illegal conduct, which HARAK did not commit and which FILOSETA did not witness. All charges against those arrested at this location, including plaintiff HARAK, were subsequently dropped by the Manhattan District Attorney.

159.    Following his arrest, HARAK was handcuffed and transported to Pier 57. The handcuffs were left on for several hours, causing him substantial pain and discomfort. At Pier 57, he was herded into cold, overcrowded wire cages for many hours where he had to sit or lie on the floor in order to rest or sleep. Because the floor and walls were contaminated and filthy, HARAK was exposed to what he fears may be some illness related to exposure to toxic chemicals and substances. He was denied adequate toilet and sanitary facilities.

160.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, HARAK has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

### Plaintiff Rachel Heinold

161.    At the time of her arrest, plaintiff RACHEL HEINOLD was teaching art at SUNY New Paltz. She was arrested on August 31, 2004, at approximately 8:30 to 9:00 p.m., at the southeast corner of 34th Street and 6th Avenue. At the time of her arrest, Heinold was not violating any law or lawful order from a police officer. Her arrest was totally without any probable cause. She was held for approximately 36 hours.

162.    At the time of her arrest, plaintiff HEINOLD was standing on the sidewalk and not blocking any vehicular or pedestrian traffic. At all times, she followed the directions of NYPD

63

police officers. At no time was the group she was with, or the plaintiff herself, ever ordered to disperse. Indeed, when it appeared that police officers were massing in the area, she attempted to leave but was unable to do so because of police barricades. Defendant Deputy Chief STEPHEN PARAGALLO made the decision that everyone on the corner where plaintiff was standing was to be arrested. Defendant Captain CROSSAN directed his officers to make these arrests and supervised them in doing so. Defendant Sergeant RAFFI OVANESSIAN told plaintiff's assigned officer, defendant P.O. DENISE ROSE-HINKSMAN (Shield No. 19599), what HEINOLD had allegedly done to warrant arrest. The information conveyed by OVANESSIAN to ROSE-HINKSMAN was false. At no time did Sergeant OVANESSIAN or any other officer have any cause whatsoever to arrest plaintiff, let alone probable cause. Under penalty of perjury and with the knowledge and approval of her supervisors, defendant ROSE-HINKSMAN swore to a false criminal complaint attesting that she personally observed HEINOLD engage in illegal conduct, which ROSE-HINKSMAN admits she did not observe and which plaintiff did not commit.

163.    Following her arrest, plaintiff HEINOLD was subjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort. She was transported to Pier 57 where she was herded into cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep. Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals. She was also denied adequate toilet and sanitary facilities.

164.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, HEINOLD has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

64

**Plaintiff William Hobbs**

165.    Plaintiff WILLIAM HOBBS is employed as a real estate agent. He was arrested on
August 31, 2004 at approximately 9:00 p.m. on 35th Street between Fifth and Sixth Avenues. At the
time of his arrest, Hobbs was not violating any law or order from a police officer. His arrest was
without any cause, let alone probable cause. He was held for approximately 36 hours.

166.    On August 31, 2004, HOBBS left his work. He then observed the political protests
which were occurring between Union Square and Herald Square. After spending a couple hours in
the vicinity of Union Square and Madison Square, he went to Herald Square. When he reached 35th
Street in between Fifth and Sixth Avenues, he observed rows of defendant DOE and ROE police
officers blockading 35th Street at both Fifth Avenue and Sixth Avenue. These police actions were
taken at the decision and order of defendants BRUCE SMOLKA and ANTHONY BOLOGNA.
Realizing that he was trapped, HOBBS asked for permission from defendant DOE and ROE police
officers to leave, but was refused.

167.    Shortly thereafter, HOBBS was handcuffed and arrested by one of the DOE/ROE
defendants at the decision and order of defendant BRUCE SMOLKA. Defendant NEIL
RODRIQUEZ (Shield No. 21015) was assigned as HOBBS arresting officer. Defendant
RODRIGUEZ falsely swore, under penalty of perjury and with the knowledge and approval of his
supervisors, to HOBB's criminal complaint accusing him of disorderly conduct. RODRIGUEZ,
however, never saw the plaintiff engage in the alleged offence he was accused of committing, nor did
HOBBS commit such offence.

168.    Following his arrest, HOBBS remained handcuffed for many hours. He was
transported to Pier 57 where he was herded into overcrowded wire cages for approximately 14 to 15

65

hours. He had to remain standing and was deprived of rest and sleep. Because the floor and walls which were contaminated and filthy, HOBBS was exposed to what he fears may be some illness related to exposure to toxic chemicals and substances. He was denied adequate toilet and sanitary facilities.

169.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, HOBBS suffered physical pain and suffering, mental anguish, and emotional distress.

### Plaintiff Deirdre MacNamara

170.    Plaintiff DEIRDRE MACNAMARA is a resident of the City of New York and an actress and medical technician. She was arrested on August 31, 2004, at approximately 9:00 p.m., on 17th Street between Broadway and 5th Avenue. At the time of her arrest, MACNAMARA was not violating any law or order from a police officer. Her arrest was totally without any probable cause. She was held for a total of approximately 45-50 hours before she was released.

171.    Before her arrest she had been browsing at Barnes & Noble on Union Square and 16th Street. Thereafter she headed north on Broadway intending to go to a restaurant. As she walked up Broadway she noticed others walking on the sidewalk who appeared to be engaged in a march relative to the RNC. When she got to 17th Street, barricades prevented her from continuing north. She was directed by police officers of the NYPD to turn west on 17th Street, which she did. When she got near Fifth Avenue, she was stopped by a barricade that the police had erected across 17th Street at Fifth Avenue. NYPD police officers in full riot gear were stationed at the Fifth Avenue barricade. At that point, defendant Inspector THOMAS DIRUSSO told her and others to wait while he made a call so that he could direct them further. MACNAMARA and the others waited while this

call was made. While at this location, MACNAMARA observed that barricades had been erected by the NYPD at the other end of 17th Street, which meant that she, and approximately 50-60 other people, were effectively trapped. Police officers then came into the crowd both on motor scooters and on foot and ordered the group to sit down, which they did.

172.    Shortly thereafter, MACNAMARA was arrested and handcuffed and placed into a City bus. The decision to arrest MACNAMARA and the other people at 17th Street and Fifth Avenue was made by defendant DIRUSSO and defendant Inspector WARD.

173.    Plaintiff MACNAMARA was arrested and handcuffed by defendant police officer STEPHEN NELSON. With the knowledge and approval of his supervisors, Officer NELSON falsely swore under penalty of perjury that he personally observed plaintiff commit the offences enumerated in her criminal complaint which he has since admitted he did not observe, and which plaintiff did not commit.

174.    The handcuffs were excessively tight and when MACNAMARA complained about the tightness to defendant NELSON, he told her that nothing could be done.

175.    Following her arrest, MACNAMARA remained handcuffed for 4-5 hours, causing a swollen left hand for approximately 3 weeks, numbness, which is persistent, pain, and extreme discomfort. MACNAMARA was transported to Pier 57, where she was housed in cold, overcrowded wire cages for many hours. Because of the lack of adequate facilities, MACNAMARA had to sit or lie on the floor in order to rest or sleep. Because the floor and walls were covered with chemicals, substances and dirt, which included asbestos and possibly other carcinogens, she suffered chemical burns and contact dermatitis and folliculitis and a bronchospastic response. While she was detained, the plaintiff was denied adequate toilet and sanitary facilities. There were far too few

67

toilets for the numerous people held in the various cages where she was held, no toilet paper and no place to wash or cleanse herself of the filth and toxic chemicals and other substances that were in the cages from before prisoners were placed there.

176.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, MACNAMARA has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

### Plaintiff Deepa Majmudar

177.    Plaintiff DEEPA MAJMUDAR is a vice-president at J.P. Morgan and holds a Ph.D. from Columbia University in astrophysics. She was arrested on August 31, 2004 between 7:00 and 8:00 p.m. on 16th Street between Union Square East and Irving Place. At the time of her arrest, MAJMUDAR was not violating any law or order from a police officer. Her arrest was totally without any probable cause. She was held for approximately 45-50 hours.

178.    On August 31, 2004, MAJMUDAR, who had the day off from work, went to a bookstore on Fifth Avenue near 14th Street, then went to Union Square and enjoyed an afternoon reading. After a few hours, at approximately 7 p.m., she headed east to catch an uptown bus to go home. When she got to 16th Street between Union Square East and Irving Place she observed several hundred RNC protesters and other observers peacefully gathered at the same place. When she got to Irving Place, she was not allowed to proceed further due to a line of NYPD officers on motor scooters, blocking her way and refusing to allow her to proceed. She then turned and walked back toward Union Square, but found her way blocked at Union Square East by another line of NYPD officers, under the direction and supervision of defendant Lt. MARK KEEGAN.

179.    Shortly thereafter, MAJMUDAR was ordered to sit on the sidewalk where, at the

68

decision of defendant Inspectors JAMES ESSIG and GERALD DIECKMANN, she was arrested and handcuffed, despite the total absence of any probable cause for her arrest. Defendant Inspector THOMAS GALATI approved the arrest decision. When one of the protesters attempted to argue with a police officer that MAJMUDAR was merely an innocent bystander, one NYPD officer defendant shouted, in sum and substance, "You fucked up punks! It's because of you punks that they are being arrested." In fact, one police officer admitted that there was no basis for her arrest, stating, in sum and substance: "Sorry but you were at the wrong place at the wrong time." Later, defendant police officer TYRONE RIGGAN signed a criminal complaint, under penalty of perjury and with the knowledge and approval of his supervisors, falsely accusing MAJMUDAR of acts he did not witness and that she did not commit.

180.    Following her arrest, MAJMUDAR remained handcuffed for many hours, causing pain and discomfort in her left shoulder, which persisted, and swelling in her hand. She was transported to Pier 57 where she was herded into cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep. Because the floor and walls were contaminated and filthy, MAJMUDAR developed skin rashes and irritation. She was denied adequate toilet and sanitary facilities.

181.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, MAJMUDAR has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

### Plaintiff Celine Malanum

182.    Plaintiff CELINE MALANUM, at the time of her arrest, was a student and worked in a restaurant. She was arrested on August 31, 2004, at approximately 7:00 p.m., on 16th Street

69

between Union Square East and Irving Place. At the time of her arrest, MALANUM was not

violating any law or order from a police officer. Her arrest was totally without any probable cause.

She was held for approximately 35-40 hours.

183.    On the evening of her arrest, MALANUM went to the Union Square area **with** her

friend plaintiff SONIA CHANDRA for dinner and a drink. When CHANDRA and MALANUM

arrived at Union Square, they entered Union Square Park to observe the activity there. While in the

park, they heard a band playing as its members traveled north on Union Square East. CHANDRA

and MALANUM, walked north on Union Square East and turned east onto 16th Street to observe the

band. There were several hundred protesters and observers peacefully gathered at the same place.

When MALANUM reached to Irving Place, she was not allowed to precede further due to a line of

defendant DOE and ROE officers on motor scooters, blocking her way and refusing to allow her to

pass. These officers directed MALANUM toward the Union Square East end of the block.

MALANUM then turned back but found her way blocked at Union Square East, by more DOE/ROE

defendants, under the direction and supervision of defendant Lt. MARK KEEGAN. She and others

were ordered to sit on the sidewalk where, at the decision and direction of defendant Inspectors

JAMES ESSIG and GERALD DIECKMANN, plaintiff and others were handcuffed. There was no

cause, let alone probable cause for MALANUM's arrest. Nonetheless, she was arrested by defendant

KEVIN SAM, who attested, under penalty of perjury and with the knowledge and approval of his

supervisors, that he personally observed MALANUM engage in illegal conduct which he did not

witness and which she did not commit. On November 30, 2005, plaintiff was acquitted of all

charges after a bench trial.

184.    Following her arrest, MALANUM was subjected to excessively tight handcuffing, for

many hours, causing numbness, pain, and extreme discomfort. She was transported to Pier 57 where she was herded into cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep. Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals and dirt. She was also denied adequate toilet and sanitary facilities. There were far too few toilets for the numerous people held in the various cages where she was held and often no place to wash or cleanse herself of the filth and toxic chemicals and other substances that were in the cages even before prisoners were placed there. As a result, she was unable to touch her eyes, as she needed to do, in order to remove her contact lenses. Further, she was subjected to sexual harassment by defendant DOE and/or ROE officers.

185.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, MALANUM has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

### Plaintiff Diana Raimondi

186.    Plaintiff DIANA RAIMONDI is a former children's librarian. She was arrested on August 31, 2004, at approximately 4:00 to 4:30 p.m., at or near the intersection of Church and Fulton Streets, near the site of the World Trade Center. At the time of her arrest, RAIMONDI was not violating any law or order from a police officer. Her arrest was totally without any probable cause. She was held for approximately 50-52 hours.

187.    On the day of her arrest, RAIMONDI decided to peacefully protest the RNC by attending a vigil at the site of the World Trade Center scheduled for that afternoon. After that vigil, the group assembled on the west side of Church Street at the intersection of Fulton Street. Their intention was to go east to Broadway, and then to march up Broadway. This route had been

71

explicitly approved by, *inter alia*, defendant Inspector THOMAS GALATI, who was responsible for NYPD operations at that time and location. Before the march had processed half a block, defendant Assistant Chief TERENCE MONAHAN suddenly screamed, in substance, "You are all under arrest." This decision was made in conjunction with defendant GALATI. NYPD officers surrounded the group, including the plaintiff RAIMONDI, as well as non-protesting bystanders, with plastic orange netting and proceeded to handcuff everyone and transport them to Pier 57. At no time was the group or the plaintiff RAIMONDI ordered to disperse and/or given an opportunity to do so. At no time was there cause, let alone probable cause, to arrest RAIMONDI. Under penalty of perjury and with the knowledge and approval of his supervisors, plaintiff's arresting officer defendant P.O. BOYLE falsely swore that he had personally observed plaintiff engage in alleged conduct that formed the basis for the purported probable cause for her arrest. P.O. BOYLE, however, admits he first saw his arrestees only after the decision to arrest had been made. All charges against those arrested at this location, including plaintiff RAIMONDI, were subsequently dropped by the Manhattan District Attorney.

188.     Following her arrest, RAIMONDI was subjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort. She was transported to Pier 57 where she was herded into cold, overcrowded wire cages for many hours. Given the filthy condition of the floor and walls, RAIMONDI stood or squatted for many hours while being forced to have contact with and to breathe in potentially hazardous chemicals. She was also denied adequate toilet and sanitary facilities.

189.     As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, RAIMONDI has suffered physical injury, pain, and

72

suffering, mental anguish, and emotional distress.

### Plaintiff Wendy Stefanelli

190.    Plaintiff WENDY STEFANELLI is an artist and costume designer. She was arrested on August 31, 2004, at approximately 8:30 p.m. on Park Avenue between 26th and 27th Street. At the time of her arrest, STEFANELLI was not violating any law or order from a policy officer. Her arrest was totally without probable cause. She was held for approximately 45-50 hours.

191.    On August 31, 2004, STEFANELLI had just gotten out of work and had met a friend for a drink. They were in the vicinity of Park Avenue and 26th Street when she observed people who appeared to be protesters walking on Park Avenue. They also observed a number of police officer in the same area. Shortly after STEFANELLI began observing this scene, she saw a police officer pushing into the pavement the head of a man who was already handcuffed. She went over to the officer and asked, "Please don't hurt this man."

192.    Following the above quoted statement, STEFANELLI was arrested almost immediately by one or more of the DOE/ROE defendant officers. The criminal complaint against her states that defendant P.O. MELISSA ROMAN was informed by defendant Sergeant MICHAEL INGRAM that STEFANELLI engaged in conduct which provided the alleged probable cause for her arrest. Neither ROMAN, as she admits, nor INGRAM observed STEFANELLI violating any law or regulation of the State or City of New York, nor did STEFANELLI do so. Defendant Captain DERMOT SHEA and Sergeant MICHAEL INGRAM supervised, and were in whole and/or in part responsible for, the policing of events on Park Avenue between 26th and 27th Streets, including the arrest of plaintiff STEFANELLI.

193.    Following her arrest, STEFANELLI was subjected to excessively tight handcuffing

73

on two occasions. The first time was for 4 to 5 hours following her initial arrest and the second for several more hours when she was transported from Pier 57 to Central Booking. The two periods of excessive handcuffing caused her extreme pain, discomfort and numbness. She was transported to Pier 57 where she was herded into cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep. Because the floors and walls were contaminated and filthy, STEFANELLI was exposed to what she fears may be some illness related to exposure to toxic chemicals and substances. She was denied adequate toilet and sanitary facilities. She was denied water for several hours. She was also denied medical care, notwithstanding her requests for such attention.

194.     As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, STEFANELLI has suffered physical injury, pain, and suffering, mental anguish, and emotional distress.

### Plaintiff Randall Steketee

195.     Plaintiff RANDALL STEKETEE is a law student at New York Law School. At the time of his arrest he was a paralegal at a large Wall Street law firm. STEKETEE was arrested on August 27, 2004 at approximately 10:00 p.m., at the corner of 9th Street and Second Avenue. At the time of his arrest, STEKETEE was not violating any law or order from a police officer. His arrest was totally without any probable cause. He was held for approximately 33 hours.

196.     On August, 31, 2004, STEKETEE rode his bike to work. After work he rode his bike to attend a play with friends on 54th Street between Eighth and Ninth Avenues. After the play, he rode his bike home where he was going to meet his friends who had attended the play with him. STEKETEE lived near the corner of 7th Street and Second Avenue. When he got to the corner of 8th

74

Street and Second Avenue he observed a large group of people on Second Avenue between 9th and 10th Street and he went to observe what was going on. He rode up Second Avenue to 9th Street. At this point, he saw that there were numerous police officers at 10th Street and decided to leave and continue on to his home. When he attempted to leave, he found his path blocked by a row of police officers, who refused to allow him to pass, although he explained to them that he was not part of any demonstration or protest and was on his way home.

197.    Shortly thereafter, STEKETEE was arrested by, and at the direction of, one or more ROE or DOE defendants. Defendants Deputy Commissioner GARY MCCARTHY, Chief of Department JOSEPH ESPOSITO, Chief of Patrol NICHOLAS ESTAVILLO, Assistant Chief MICHAEL SCAGNELLI, Assistant Chief TERENCE MONAHAN, former commanding officer of Patrol Borough Manhattan South, BRUCE SMOLKA, Deputy Chief JAMES O'NEILL, Inspector JAMES MCCARTHY, commander of the Disorders Control Unit, THOMAS GRAHAM; and Captain JOSEPH DOWLING supervised, and were in whole and/or in part responsible for, the policing operations on Second Avenue between 9th and 10th Streets. STEKETEE was handcuffed and his bike was confiscated.

198.    Defendant P.O. MICHAEL BALICKI was assigned as STEKETEE's arresting officer. Defendant BALICKI, under penalty of perjury and with the knowledge and approval of his supervisors, falsely swore to a criminal complaint attesting he personally observed plaintiff parading without a permit and two counts of disorderly conduct, notwithstanding that BALICKI did not witness these acts, nor did STEKETEE commit them.

199.    Following his arrest, STEKETEE remained handcuffed for several hours, causing extreme pain, discomfort and numbness which persisted and for which he has sought medical